The Honorable Judges of the United States Court of Appeals for the Fourth Circuit. Good morning, judges. My name is Paula Poteczak and I will be arguing on behalf of Marie Laurent-Workman. The appellant seeks this court to reverse the lower court in three particular areas. First, a reversal for the count four of the complaint, which is what I would consider a classic retaliation complaint based on non-selection. Second, a reversal of the second part of count four, the discrete acts retaliation. And then a reversal of the two hostile work environment claims, one based in retaliation, the other based in race, gender, and sex, national origin. And those to be reversed based on the use of, for two reasons, a change in the standard as it applies to retaliatory hostile work environment, and also because under the standards for motion to dismiss, Ms. Laurent-Workman has properly pled, quite frankly, all of the claims that are before the court. As to count four on the causation for retaliation claim and non-selection, the lower court used the standards set forth in Ziske v. Mineta. That standard has been changed, at least in unpublished opinions, by Burlington Northern, and the Fourth Circuit has routinely adopted the Burlington Northern standard in retaliation cases. In the lower court, the judge found, under the old standard, that Ms. Laurent-Workman did not properly plead that there was retaliation in the non-selection, but that the defendants did not have knowledge of the protected activity, and that the time and causation could not be established. Under the old standard, Ms. Workman has established that. Insofar as knowledge is concerned- I'm sorry, I don't understand. What standard has been changed here? The standard for finding retaliation under the Supreme Court decision of Burlington Northern, in that case, the court held in a private sector case explicitly that there had to be a protected activity, but that the causal connection need not be adverse circumstances, but was rather adverse employment action, but rather such an activity that would cause the plaintiff- I'm sorry, I understand that. So the materially adverse standard. Materially adverse- But the district court decided this issue on causation grounds. In Burlington Northern, is there a new causation standard that you want us to apply? Causation under Burlington Northern is- well, in Judge Trenga's opinion, he found no causation because there was too much time in between. He said there was enough time that you could not infer causation solely from temporal proximity. And in doing so, he ignored certain- the case can be reversed on retaliation on two grounds. One, under the quote-unquote old standard, causation is established. There was enough pled in the complaint so that causation based on time could be established. And Judge Trenga simply either conflated, ignored, whatever, certain allegations that were made in the complaint. That's as to causation based on time. And this- So you're saying- I'm sorry, maybe tell me your second point and maybe it will- And secondly, the judge also dismissed the case because the defendants did not have knowledge. And in order to- No, he assumed all the knowledge. And the district court assumed the knowledge and said, you know, best possible case scenario, looking at knowledge most generously, everyone would have had knowledge something like two months before, right? And that the two months is- The judge seemed to focus that the decision maker did not have knowledge of the second amended complaint and only of the first amended complaint. But then the court went on to say, even assuming that the decision maker did have that knowledge, now everyone has knowledge two months beforehand. And from that, I'm not going to infer the two-month gap. I can't infer from that alone causation. In making that decision, he ignored certain things that occurred during the selection process, one of which are the questions that Ms. Castro requested- asked of the Ms. Laurent Workman that directly intimated a knowledge of EEO activity and her quote-unquote inability to get along and asked her during the interview to explain that. That occurred on February 7th, which makes the time causation somewhat shorter. But in addition, it was also Ms. Workman- Ms. Castro's first opportunity to discriminate or retaliate. Can I ask you about that? Because Ms. Castro, right, had been her second-line supervisor since July. And the complaint alleges that she had knowledge of all of this in July. So how was this a first opportunity? I mean, isn't it usually the case that if a supervisor wants to retaliate, they can find a way to do it? The supervisor needs something to retaliate with. And if there are no promotions from July when Ms. Castro- But your whole complaint is that the- and now I'm sort of mixing your counts- but that in this office, they were retaliating through these kind of lower-level workplace harassment sort of things. But Ms. Castro never did any of that for seven months, right? Well, for- did not do the smaller retaliatory actions or discriminatory actions. And she started- Ms. Castro took over the position in sort of mid-late July so that really that is not all that much time for- It's seven months before the non-selection. But that was really the first opportunity. Well, I don't understand how that can be a first opportunity for a supervisor. Supervisors, at least in my experience, supervisors have all kinds of ways of making their employees' lives unpleasant. At the second level of a supervisor, given the job duties of Ms. Laurent Workman, the second-level supervisor would not necessarily have as many opportunities- But none of this is in the complaint, right? It's not as though the complaint pleads in any way that this was the first opportunity, given the work relationship. Here are some facts about the second-level supervisor and her relationship with the employee that would have made this the first opportunity. There were allegations in the complaint as to the second supervisor status and when Ms. Castro came into the position. And there were also allegations involving communications between Ms. Castro's first-line supervisor with the second-line supervisor. And those communications occur both before and after Ms. Castro assumes her position. As a second-line supervisor and as the deciding official. And in that sense, this is the kind of opportunity that a second-line supervisor would have, most notably to retaliate once they had knowledge. And in fact, Ms. Castro was advised by the first-line supervisor, Mr. Calife, that he would not rehire Ms. Castro. And that conversation actually occurred in an email that was inadvertently cc'd to Ms. Workman just before she applied for the position in December of 2019. So there is clear allegation in the complaint that the inference can be made that Ms. Castro knew about the protected activity. And that within this context, it was the first opportunity for her to take such a, quite frankly, drastic retaliatory action against Ms. Workman for complaining and exercising her EEO and other protected activity rights throughout the course of her employment with the EEOC, with the Department of Army. Beyond that, the lower court did not dismiss her other discreet acts complaint. And that should be reversed for the same reasons, because there was sufficient allegations in the complaint to show not only that the acts occurred, but that the standards were not met, that she met the standards for consistency, and these occurred throughout her career. And these were sort of ignored by the lower court. Finally, we ask that the court reverse the decision for retaliatory hostile work environment as well as for the hostile work environment based on race and gender, sex, and national origin, and to use the reduced standards that the court has enunciated in Caldwell v. Johnson. And I reserve the rest of my time. Let me ask you something. Yes. How many claims do you want us to send back? Three. Three? Three. Four, five, and six? Yes, Your Honor. And counts one, two, and three, you've abandoned? Yes. Thank you. Good morning, Your Honors. Peter Baumhardt on behalf of the government, and may it please the court. It is the quality of a plaintiff's allegations, not quantity, that determines their plausibility. The plaintiff in this case certainly has made a lot of allegations, but regarding the three claims that she is pursuing on appeal, we have to assume all those are true. Your Honor, you have to assume the well-pled facts are true, not any conclusory allegations or formulaic recitations of the elements. And to that point, the district court correctly held that the amended complaint, once stripped of those many conclusory allegations and formulaic recitations of the elements, does not plausibly plead a Title VII violation, and we respectfully ask that this court affirm the judgment. Starting with plaintiff's discrete act retaliation claim, the elements of this claim are protected activity, an adverse personnel action, and a causal relationship between the two. Only the third element, causation, is at issue here because the plaintiff has waived anything but her non-selection on this claim. Because it was not clear from the amended complaint, the district court confirmed at the motion to dismiss hearing which discrete actions the plaintiff was challenging, and she limited this claim to her non-selection. But there is no plausible causal connection between plaintiff's protected activity and her non-selection. For one thing, there is insufficient temporal proximity. This court has held that even a two- to three-month lapse between protected activity and an adverse action is too long. Here, there is an eight- to nine-month lapse between when plaintiff alleges that Ms. Castro, the selecting official, learned of her protected activity in July 2019 and the allegedly unfavorable interview on February 7, 2020, and the ultimate non-selection on March 5, 2020. Plaintiff's amendments to her EEO complaint do not bridge that temporal gap. For one thing, as the district court noted, there were no non-speculative allegations that Ms. Castro even knew of that activity. But even assuming that she did, as the district court did, the latest amendment occurred on December 2, 2019, which is still more than two months before the interview and more than three months before the non-selection. That temporal gap is still too long to support a plausible inference of causation. Plaintiff's argument that Ms. Castro took adverse action at the first available opportunity  that Ms. Castro became her second-line supervisor in July 2019, seven months before the interview and eight months before the non-selection, and that the two of them, furthermore, had a working relationship. In fact, plaintiff alleges no retaliatory behavior by Ms. Castro at all during almost the year that she was plaintiff's second-line supervisor up to that point. As for the argument that there's some distance between plaintiff and her second-line supervisor, again, as Judge Harrison noted, nothing like that is alleged in the complaint. If anything, plaintiff alleged that she was close enough to her second-line supervisor, Ms. Castro's predecessor, to ask him to reach out to Ms. Adams to email her some data. Other aspects of the amended complaint further undermine any inference of causation. For example, plaintiff has pled nothing about the position that she applied for, her qualifications, or the qualifications of whoever was selected. She has not even pled that someone was selected. Further, Ms. Castro was not the only person involved in the selection process, and plaintiff does not dispute that none of her protected activity was against Ms. Castro herself. How did Ms. Castro's role in that determination weigh in terms of the other two? I'm sorry, I missed the last part of that question. Ms. Castro's role, you said she was not the only one, but didn't she have a heavier hand in that decision as to what decision? Your Honor, I believe the complaint alleges that she was the selecting official, but it doesn't really explain how the interview panel, which was made up of three people, Ms. Castro included, how any sort of selecting power was distributed among the three of them. All that's alleged is that there was a panel that Ms. Castro scored her a 28, another panelist scored her a 37, and there's no allegation as to how the third panelist scored her. So I think we just can't tell from the amended complaint. At best, it's that there was a three-way exchange of information. And to the point of the panel, there's no allegation that the employees against whom And plaintiff also conspicuously fails to plead how she was scored relative to other applicants. What about Mr. Khalifa's email to Ms. Castro, sort of disparaging the plaintiff in connection with his position? So the plaintiff has alleged that he sent that email on December 2, 2019. So, again, still too much of a temporal gap there, for one thing, to just infer that Ms. Castro's decision was based on Mr. Khalifa's comments. It's also further undermined by the fact that he sent that email on December 2, and plaintiff didn't even apply until December 6. So the fact that plaintiff was even interviewed cuts against inferring any sort of retaliatory animus on Ms. Castro's part, since Ms. Castro and the panel could have simply declined to interview her if she wanted to retaliate. Those are a lot of inferences you're drawing, aren't you? It would be all in your favor. Your Honor, these are reasons why it's not possible to draw an inference of causation. Maybe some discovery would help things out. Your Honor, discovery is only appropriate if the plaintiff plausibly pleads a claim in the first instance. And as I've explained and as Judge Trenga explained at length in his opinion, the plaintiff hasn't done that, despite two opportunities to do so, a complaint and an amended complaint. So it's all these deficiencies are why it's not plausible to infer that plaintiff's protected activity caused her non-selection. I'd like to say a few words about plaintiff's hostile work environment claims as well. There are two such claims at issue on this appeal, one based on retaliation and one based on- You're turning to the hostile work environment claim now, you say? Yes, Judge King. What counts that? I believe those are counts five and six. One of them is based on retaliation and one is based on race slash color, sex, and or national origin. Both of those claims fail as a matter of law. There was a lot of rough talk going on, wasn't there? Your Honor, there were certainly some offensive comments made. Very offensive comments made. We don't deny that. But this Court's precedence- Do we have to accept what's in the complaint on that? Yes. Those allegations we would consider well pled. You don't contest what's in the complaint at all. You're saying believe what's in the complaint and it's all right to do that. Well, so we would not contest for purposes of our motion to dismiss since we have to accept the well pled faxes, please. That's what 12b-6 is all about. We understand this. It's up here on 12b-6. Yes. So the fax in the complaint we have to accept and you have to accept. That's true, Your Honor. So, yes, we don't disagree that they're offensive comments. We would say that this Court's-we're certainly not saying that it's all right, to Your Honor's second point. But this Court's precedence makes- You're not saying it's all right. It's just a little bit bad. It's not enough to be hostile. Your Honor, we would say that, yes, it's not severe or pervasive in this Court's precedence. It's not severe and pervasive. Correct. You're saying it's not severe and pervasive. Right, which is the standard. The complaint says it is, right? I think the complaint does call it severe and pervasive, but that is a classic formulaic recitation of an element. It's one of the elements of the complaint. Exactly. That's right. And they specify, though, a litany of hostile comments. So there are several comments alleged, Your Honor. Yes. But this Court's precedence- Comments. I'm not talking about counsel. Hostile comments. Racially hostile comments. Yes, Your Honor. Gender hostile comments. So I don't recall that there were any gender-based comments, Your Honor. I believe there were comments such as you people, but I don't recall any gender-based- The racial stuff's good enough to get you to get them to discovery. So, Your Honor, if we think it is- Your Honor, yes, if you think it is- You don't think it is, and you argue it's not, and that's your job. You're here representing the government. I am here representing the government, Your Honor. Yeah. To be clear, this is not our opinion. This is based on this Court's precedence. I understand, and we're bound by the precedent in the law, and we're going to apply it the best we can. What precedent do we have, you said, that compels us to rule in your favor in the 12B6 area? Specifically on the hostile work environment claim? We're talking about the racial, clear animus, racial animus, these several statements that went on, and when complained about, no response. And, as a matter of fact, it got worse for her to the person who she complained to. I mean, that's what's alleged here. So tell me what precedent says that this doesn't survive well-pleaded cause of action to survive a 12B6. It's not summary judgment. Go ahead. Tell me, because you keep saying precedent, but go ahead. What is it? Your Honor, we cited a number of cases at pages 29 to 31 of our brief and 35 to 36. I'm not recalling all of them off the top of my head, but there's several cases that involve similar types of comments where this Court held that that was just not enough to make out severe and pervasive behavior, which, again, is a workplace permeated with discriminatory intent and ridicule. I would like to say, just to divert briefly to discuss the severe pervasive standard itself, the plaintiff has argued for the Burlington Northern materially adverse standard, but the Supreme Court has never applied that standard to a hostile work environment claim. And this Court has uniformly relied on the severe pervasive requirement in hostile work environment claims in the 16 years since Burlington Northern came out. Plaintiff's counterargument is based first on a misreading of Babb v. Wilkie, which did not involve a hostile work environment claim and did not even address the severe pervasive requirement. And the plaintiff also cites an 11th Circuit case that reflexively extended another 11th Circuit decision that analyzed a private sector retaliatory hostile work environment claim. So leaving to one side the merits of that case, the different statutory language in the private and federal sector retaliation provisions precludes the application of Burlington Northern here. Burlington Northern held that Title VII's private sector retaliation provision, which broadly bars discrimination based on protected activity, extends beyond adverse employment actions to non-employment related materially adverse actions. In so doing... They're hurling these racial comments at her. She should have just go back to your desk and endure it? Your Honor, it's... I'm not sure... But sure, I'm saying that what was she supposed to do with these comments made to her consistently and continually in her work environment where she has to go and make a living? What should she do? Just go back to her desk and just say, well, I guess this is par for the course? You said because it's not... You said it's not pervasive. On what basis do you say it's not pervasive to be called these horrible things because of the color of your skin? Tell me why you think that's not pervasive and adversely impact your opportunity to make a living, to go to work every day and have to endure that. You tell me why. Your Honor, I'm certainly not trying to insinuate that it's not... I'm not asking you to insinuate. You represent the United States government. Yes, Your Honor. And I want you to tell me why is the government's position that that's not pervasive, to have to have these things hurled at you because of your race. And you say it's not pervasive. So I'm asking you, what is it? Is it something you're supposed to just say this is par for the course? What is it? I'm working for the government, the Army, the protector of people. I mean, go ahead. Go ahead. But tell me why. You keep going around, but just tell me what is it. Are you familiar with the New Corps case? I'm sorry? The New Corps case out of South Carolina? I'm not familiar with that case, Your Honor. The case where they were making, over the loudspeaker, jungle sounds.  I am not familiar with that case, Your Honor. All right. I'm sorry. In the cases you have, what were they doing in the cases that we said it was okay? I believe there was one case we cited where there was a co-worker, a supervisor, I can't remember off the top of my head, but said something like, I know how all Latinos are. He said that only Mexican women have long hair, those sorts of comments. I believe that was the Sorto case, Sorto versus Autozone. And they said because he mentioned long hair, that wasn't enough. I believe that's what this court held. And you compare these comments to that? These are, again, I'm asking you, do you compare, you don't have to backpedal. You're here advocating for the United States. I'm just saying, are you saying that you're comparing these on the same level? It's just a question. I apologize. I'm not trying to backpedal. I'm not trying to obfuscate or anything. Just answer the question. You cited that as an example. You think these are on the same level? There is a continuum of these types of comments. This court's precedence, we believe we have a good faith argument that this falls on the side of not severe and pervasive as a matter of law. It obviously is imprecise, being qualitative as it is. But we would not have made the argument if we didn't think there was a good faith basis for it. Can I ask you a question about pervasiveness? One thing that, I'm just not sure I've seen a case quite like this before. So I think you do point this out in your brief that in the sort of chronology of events here, the comments, the offensive racial comments, they stop as of something like December 18th. So I think the suggestion is they're not that pervasive. But the other way of looking at it is that when they're going on, they're actually quite clumped up. They're happening pretty regularly for a chunk of months there. And so I don't know which way that cuts is my question. Your Honor, I was eventually hoping to get to the point in response to Chief Judge Gregory's question. But yes, the comments did stop as of November 2018. Is that the comments from Adams or also the terrible comment from the supervisor, which was not made to her? It was both, Your Honor. Okay, I thought that one was in December. Okay. I'm sure you're right. Yeah. Okay. But, yes, so it's, I think you have to look at the totality of the circumstances when you look at the severe and pervasive element of a hostile work environment claim. And the fact is that there were. Well, we don't know what the totality of the circumstances, what the totality is without some discovery. Well, so we still have to say. All we have is, what we got is a complaint here. It's up here on 12B-6. That is true, Your Honor. Although. Let's get the totality of the circumstances. Then you can really weigh it. Your Honor, the fact that it's a complaint and it's dismissed at the 12B-6 stage has not stopped this court from holding that something is not severe or pervasive as a matter of law in the past. And we would say that, you know, this is plaintiff's second attempt at pleading. So this is. But Judge Harris' question, I'm not speaking. The question raised at least a question of ambiguity. It could be raised, you know, it could cut one way or the other. At some period, they seem to be flurry, flurry, flurry, flurry, and then they stop. Well, there may be explanations for that, as Judge King talks about the totality. But at 12B-6, it's like right now it is cut off because it is just like from another planet. There's no way that could be any other reasonable interpretation for it. That's what 12B-6 is for, is as a matter of law. But we're talking about totality. You said, in your own words, there's a continuum. You talked about that in other cases, that kind of thing. Yes, Your Honor, absolutely. There is a continuum. And we've done our best in our brief to point out where this court's decisions fall along that continuum. And we do think that these comments. Are you talking about the Oglethorpe case where the woman was working in an environment where they had an effigy that they didn't even necessarily talk about her, but they were pointing to things on a calendar and referencing that kind of thing. That case, you know what I'm talking about? Your Honor, that's another case I'm not, I don't believe that was in the briefing. It's an in-bank case. It's an in-bank case. There's a court that Judge Gregory is referring to, an airplane factory. I'm just, I'm sorry, I'm not. And they were just boasting about their weekend type of activities. Not her. What weekend activities, what they were their dalliances and all of those things like that. And one could say, well, I can't be pervasive because it's not even her. It's not directed at her. But we said otherwise. Your Honor, I can't, unfortunately, speak more effectively to that case without having read it. I would be happy to submit a 28-J letter if the court would like to know. Judge Harris has a question. I think, I don't mean to cut. So just, I mean, one of the things I find challenging about this case, right, is that you alluded to this at the beginning, the number of allegations. There's a lot of allegations here. And, you know, I don't mean to make any ultimate conclusions, but, you know, your brief at least has a very compelling argument that some of these allegations are clearly on the non-severe side of the line. In fact, perhaps many of them are. And that can kind of, you know, I didn't get enough notice before a meeting. They didn't give me the checklist fast enough. And what I worry is that that can kind of cloud the picture, you know, like you lose the forest for the trees. Because if you cut away some of that stuff and now you're just looking at this series of comments that must have been happening on a fairly regular basis for a period of time and complaints about them and nothing gets done. And, in fact, it's not just that nothing happens. It's that all of a sudden your job responsibilities start getting shifted over to the person who's making the comments, making most of the comments. Like if you cut away a lot of the other stuff and you just look at that, I am hard prepped. I guess I'm just repeating the same question you keep hearing. I'm sorry. Like is there a case that says that's not severe and pervasive? I would just direct you again to pages 29 to 31 of our brief and 35 to 36. Again, there are a lot of cases that we cited. It's tough to remember all of them. And you're never going to be able to find a case directly on point. It's always a continuum. Are we more on that side or on the other? Okay. So I guess I would also just say I'm over my time. Would you mind if I wrap up quickly? Sure. Thank you. Just quickly, both claims would also fail because they lack plausible allegations of causation regarding the retaliatory hostile work environment claim. The conduct plaintiff complains of occurred both before and after her protected activity, which undercuts any inference that it was the protected activity that was causing the conduct she complained about. And also the hostile work environment claim, to the extent it's based on sex and national origin, fails as a matter of law because the plaintiff has no allegations at all that would support an inference that her sex or national origin had anything to do with the conduct that she complains of. So at this point, Your Honors, unless you have further questions, we'll stand on our reefs and we respectfully ask that this Court affirm. All right. Thank you, Mr. Baumhardt. Ms. Patozak? Your Honors, I'd like to address Judge Harris' and Judge Gregory's and Judge King's issue regarding the severe and pervasive nature of the act and how they occurred in this case and why it is death by a thousand cuts. Your best claim here is the hostile work environment, isn't it? Yes, it is. And it's better, it's best as to the racial issue, is it not? Race and retaliation. I think in terms of egregiousness, not number, it is clearly the race. The comment about the athletes is sportscasters have been fired for less or the same thing. So as to race- You're taking kind of a shotgun approach to the whole thing. I'm wondering if your shotgun approach is helping out your case much. Well, as to race, the egregiousness is there more starkly because of what was said and what was done. Ms. Adams also was obviously either didn't understand, it could have been a cultural thing, but for whatever reason, she clearly did not like working with Ms. Adams because of her race, national origin. Just the lady that was from- That was her co-worker, Your Honor. She was the- She was Dutch. The Dutch lady. Yes. There was a term about, well, she's Dutch one time. Well, that was the excuse that she didn't understand how things work, I guess, because she's Dutch. That was an excuse for the government. Yes, and perhaps that may also be the reason why- She should be overlooked because she's Dutch. And that may also be the reason why- If she's working for the United States of America. I think hopefully things would have been different. We don't know. And there's also the notion that she was a foreign national working for the- at least on the United States base. And so she may have been treated differently because of that, but that's an inference that's being made. However, in terms of the retaliatory actions that were taken against Ms. Laurent Workman, they were more constant than the racial ones in a lot of ways, but not as egregious until you reach the ultimate one of non-selection. But it is actually all of the circumstances that she was exposed to in her work environment for about- she worked there for two years, basically. For about 18 months of those two years were pretty constant. And things were happening to her in terms of her job and how she could perform her job with duties being taken away. Her position description was changed and then put back in contravention of Army regulations so that things were happening to her on a regular basis just from a career and progression standpoint and the ability for her to actually do her work. So while there are a plethora of what may be seemingly minor events that occurred to her, they were based either in retaliation or in race, and it adversely affected her work environment. And the severe and pervasive standard, quite frankly, is best decided after summary judgment because it is more of a factual- and the courts have held that it is a factual determination that is to be made as to severe and pervasiveness. And certainly there are enough allegations in the complaint that it was pervasive and the racial comments were certainly severe, even if the United States does not think that what happened to her career-wise or from a protected activity standpoint was severe and pervasive. And for those reasons, we ask that the court reverse the lower court decisions as to counts four and five and six. All right. Thank you, Ms. Potosak. Thank you both for your arguments and being here today. We will not come down and greet you, unfortunately, because of the times being as they are, but know very much that we appreciate you being here, and thank you so much for your help in these cases, these tough cases. Thank you so much. Be safe and be well. Thank you so much.
judges: Roger L. Gregory, Robert B. King, Pamela A. Harris